Good morning. May it please the court, my name is Lee Hutton and I'm here on behalf of the appellant, EDS. I would ask to reserve, if I could, five minutes for rebuttal. Your Honors, for a five-day trial with only four live witnesses, this, as you can tell from the briefs, is a case with complex, unorthodox, and confusing facts. I will not walk through them in this argument, only to say that I did study the record, and if anyone should have any question, I do think that I can probably, I understand the record fairly well. There's one small thing that I noticed as I was reading the briefs that isn't quite as clear, and that is, where's MCI? MCI, as we know, was a party to the contract. It was the parent of System House, the company that Mr. Healy worked for. It also was in control of those plans that are at issue. And finally, it was actually Mr. Healy's employer after EDS bought System House, because under the deal terms, as we discussed in the brief, Mr. Healy didn't transition to EDS. He remained an MCI employee, which was one of the things that caused people to kind of scratch their head about how to terminate him. Remained an MCI employee unless and until he was ever able to return to work, which never happened. Well, the short answer is, MCI was the lead plaintiff here, but it was part of, as we recall, the WorldCom empire that went down, went into bankruptcy, and although the same claims were asserted against MCI after a bankruptcy stay, it was dismissed from this case, those same claims were then lodged against MCI into bankruptcy, and ultimately there was, I think, a settlement on the severance pay piece, which Judge Carlton did credit us for, but as to nothing else. In any event, I'd like to focus most of my time, if I could, on the breach of contract piece, and that part of it, the facts really aren't all that complicated, because the separation agreement that governs Mr. Healy's claim for severance pay, which we concede, but the stock options and the ISUs, which we don't concede, is relatively straightforward. There isn't a whole lot in it that deals with it. It's clear from looking at it, it's a contract between MCI and the subsidiaries, which is his employer, SystemHouse. We also concede that EDS came in and bought SystemHouse stocks, so EDS really stands in their shoes. But the stock option pieces and the ISU pieces that are related in the agreement really are, as we're going to see, creatures of a contract with MCI, and for that reason, it's very important that MCI is a party to the agreement. Contrary to what the trial court found, that separation agreement really is not silent on the issue of the stock options. It has some meaningful guidance there, and particularly in section 1.3 of the separation agreement, there's one sentence that pertains to the stock options, and what it says, it says, The next sentence, which deals with the termination without cause, Mr. Healy conceded, and the trial court, I think, properly found, does not relate to the stock options. It relates to the ISUs and other stock piece. The second piece of the separation agreement, which is key, is section 5.2, and it spells out that MCI and the employee acknowledge that this agreement does not modify any term, condition, or provision of MCI's stock option plan, or, and aptly missed this in their brief, or any stock option agreement entered into. So the separation agreement says on its face, when we're deciding these stock options, we're going to look at the plans and the agreement, and they control. So we contend, and we tried to argue it, you know, effectively in our brief, that both the plan and the agreement leave no room for interpretation. That they both say that if you become disabled, if you become disabled, then until you return to work, there is no vesting of your stock options. There's a little talk about pro rata, pro rata vesting, but it didn't apply, everyone agrees, because Mr. Healy's options were less than a year old at the time. The plan, and we point to it in our reply brief, says the same thing. And what eliminates any shadow of a doubt that we would contend any latent ambiguity, is if you look at section 5.3 of the stock option agreement that Mr. Healy and MCI entered into in February of 98, there are what I call in my brief the seven magic words that make it clear, notwithstanding, the seven words are notwithstanding section 3.3, which is the section of the agreement that deals with termination without cause, notwithstanding section 3.3, if you become disabled, and then it spells out that nothing vests. Neither the trial court nor Appley in their brief describe any other meaning to these words. And it's fundamental concept of contract interpretation that you can't just ignore them. In the words really do, they eliminate any question about it. Furthermore, the record is barren of any evidence suggesting that MCI ever administered this plan any differently than to not allow options to vest. So the long and the short of it is that even if Mr. Healy had been terminated on December 31st, 1998, as he contends in the trial court says he should have been, it wouldn't have mattered. And the reason it wouldn't have mattered is because under the agreement, the stock option agreement, since he went out on disability prior to that, his options didn't vest. Excuse me. I thought there was an express agreement that options vested something like 60 days after termination. That's why this record is so confusing, Your Honor. You're right, but you're in the wrong benefit. For the ISUs, they are, and we do agree with that, that the ISUs should have been distributed within 60 days after that date. But the stock option, but the ISU plan clearly says while you're on disability, you still vest. But there are two different plans, and the stock option plan says just the opposite, which is why, you know, we believe as to that element of damages, which is approximately $600,000. The trial court just missed it. Let me now jump to the ISUs. For purposes of Healy's ISUs, the incentive stock units, his separation agreement did say that he will be treated as if a termination without cause. And to cut to the chase, the ISU plan and the ISU agreement had different terms, as I just mentioned, about what happens when you're on disability, and they would have continued to vest while he was on disability anyway. MCI clearly messed up by not releasing his ISUs in early 1999. And I would concede, standing here today, that System House arguably contributed to that error by failing to terminate Mr. Healy as it promised to do in the agreement. And so, therefore, EDS would be on the hook for that if it ended there. And that's the problem. The facts don't stop there, and the trial court just didn't deal with, didn't consider the next facts. And the next facts are that in the normal course, forget about the separation agreement, in the normal course, those ISUs would have matured, would have come into his possession, were his. Thirteen months later, in February of 2000, Mr. Healy admitted that. It's clear from the agreements that it would have happened then. And when it came to be February of 2000, Mr. Healy called, I think maybe it was the following month, and he called the MCI plan administrator, a man named Tom Squires, and Tom Squires made what is clear from the record is an undeniable and unexplainable mistake. Contrary to the terms, forget about the separation agreement. Just in the normal course, they should have been released in February, March of 2000. And contrary to those terms, he didn't release them. As Mr. Healy put it, Tom Squires blew it. And that was not System House's mistake. It wasn't EDS's mistake. It was solely and exclusively an MCI mistake. There is not a fragment of evidence in the record that Mr. Healy was responsible for that. And that's where the argument is that that's no breach of the separation agreement. I guess what I'm arguing is that it really is a matter of the element of damages. In other words, what you heard me say is my client's on the hook for an undeniable and unexplainable mistake. And that's what I'm arguing. he ISUs in January of 99. Okay? But after that breach they should have been released anyway 13 months later. And in looking at the measure of damages, something happened in between that my client had no power over that causes us to examine what are the damages from the breach of the separation agreement? And I would suggest to the court that the damage of this service would be freed The benefit of the bargain on the separation agreement is to give Mr. Healy the value of the accelerated receipt of those shares. In other words, the separation agreement gave them to him 13 months earlier. And the benefit of that bargain is to look at what they would have been worth then and compare it to what they would have been worth 13 months later when in the normal course he would have gotten them. The problem with this case and what's so screwy is if you do that, the number is zero because in that 13 months the stock went up. And the other screwy thing about this case is then not long thereafter the WorldCom issues arrive and the stock goes down. But no one could reasonably foresee at the time they made this bargain that MCI would refuse to release the ISUs when they came due in the normal course. And so whether you look at it as proximate cause, if you look at it as superseding cause, if you look at it as intervening cause, however you want to analyze the causation for the real damages that Mr. Healy very conceivably suffered by not getting his ISUs, they really fall on the shoulders of MCI and nobody else. And that in a nutshell is our position on that issue. We do think that the bar examiner case that we cited, I can't pronounce the plaintiff's name, but it's on page 48 of our opening brief, is quite similar in that like in that case where the State Bar of California was responsible for testing, grading, and deciding who passed the State Bar exam. And the plaintiff turned around and sued the National Conference of Bar Examiners, the multi-state people, for having bad questions. The court said, no, your damage, if you have it, isn't caused by that party. The grading of that exam, the correcting of that exam, the deciding of who passes and who fails is caused by another party. And it's not exact, but it's a very similar notion to what we are arguing. Now, the natural question is that is there anything that EDS, I mean, I would concede the outcome might be different. If System House or anyone other than MCI might have created some confusion and induced some confusion that otherwise would have caused MCI to mess up, but there's no evidence of that. Zero. Zip. The trial court didn't even deal with that issue, which is, you know, what was really rather frustrating. There was no proof offered of a nexus at trial. In reading the briefs, I don't see anything in the briefs, reading the trial court's decision. And, I mean, arguably I would even suggest that if you look at Mr. Healy's version of the events, which he puts in later in a letter to MCI's attorney, Ken Reese, he doesn't even suggest that Iman or anyone else interfered with that. It just was a screw-up. But it was not my client's screw-up. The only other item that I would like to mention on the issue of the ISUs is almost an arithmetic kind of issue. We think the ISU damages really should be zero. If anyone disagreed with that, at a minimum, Judge Carlton, and we point this out in our brief, failed to credit EDS for, I think, $133,000, which was the value of the ISUs when Mr. Healy eventually got them. We did prove that. The judge just overlooked it. It's a W-2 in evidence. As well as the value of about, I think there was about $30,000 of ISUs that had been given to him earlier. And he did admit that on his case. Roberts. What do you make of his argument that, well, he was afraid to sell them for fear it would adversely affect the recovery that he was otherwise expecting? Well, Your Honor, EDS shouldn't be saddled with ensuring Mr. Healy's investment decisions. They were worth a certain amount at a given point in time. And any measure of damages doesn't allow the – when you're talking about stock, doesn't allow the plaintiff to decide to sit on it or not and have the damages go up or down later on, depending on his investment. The money was available. Is it a mitigation problem? Excuse me, sir? Is it a mitigation problem? I wanted to cast it in mitigation. Yeah, that probably would work. My mind wasn't thinking that, but it does work. I'm going to say a word about prejudgment interest. And not much more than a word because we covered that in our brief. But something occurred to me as I was studying to get ready to talk to you that highlights why prejudgment interest isn't appropriate. And that is, beyond everything we said in our brief, it occurred to me that even Mr. Healy's calculation of the value of his ISUs changed a lot, even in the course of litigation. If you look at summary judgment, and the summary judgment order refers to that when the trial court is saying we need conflicting evidence on this, but Mr. Healy's calculation is that it would be $398,000. So that was, at one point in time, the number. At the start of trial, I believe it was $560,000. And if you look on the last day of trial, it was recalculated, more shares were added, and it jumped up to $694,000, which is the number that you see in the court's order. That's just pretty darn good evidence that this isn't a sum certain, that this isn't a calculable amount. And, in fact, one of the very cases cited by plaintiff in his brief, the Levy-Zantner case versus Southern Pacific Transportation, said that when the number at trial changes like that from the plaintiff's own side, that's potent evidence, potent evidence that liquidated, excuse me, prejudgment interest would not be appropriate. I will reserve. Just about a little over a minute and a half. We'll hear from the other side, and then you can come back. Okay. Then I'll use my minute and a half before I go. I have five minutes left, right? No. Okay. Well, we're not going to cut you off if you've got something to say, but right. If it please the Court, and if it please Mr. Healy, my client, who's now on his ninth year. He started his ninth year since he was supposed to get his money from the separation agreement on December 31st, 1998. We're now on nine years. They did not admit. And, first of all, let me tell you that he's very shy about admitting it, but if you look at his briefs, he also represents System House. He sued System House. So he can't say I need to yes and avoid anything that System House did. That won't work. But this separation agreement, this wasn't the first separation agreement that Mr. Healy had with System House. He had a prior one that was supposed to end on August 1st of 1998. There's an Exhibit O before the new agreement was made where Mr. Healy was being asked to stay on, even though in the Exhibit O he explains in great detail how he has Verger's disease. It's a very difficult disease. He can't walk more than 70, 75 feet. He's in constant pain. It's degenerative, but yes, I'll stay on. I'll stay on, but I need my disability. I have disability benefits now, and I need them. His boss, Mr. Bernstein, who's a great guy, says, okay, and he writes an email to Barbara Eyman saying, you know, we need to have him stay on. He's agreed to do that even though he has significant problems, but he needs to get his disability. But we want to keep him on. She talks to my client, and it's Exhibit P and Exhibit Q, and this is in July before the August 1st deadline comes for the first agreement. And she says, I'm not going to do it. I'm not going to do a new agreement. I don't have to. And you have until Friday because the agreement runs on Saturday to file for disability. Because if you don't file for disability before the agreement ends, you're not going to get it. So she puts them in that box. And that's what they leave out of their brief is the part of Mr. Healy's testimony where when he's asked, he says, well, you know, I have this in mind, and, you know, I was concerned about that, and that's why I applied for disability. So the trial judge, the district court judge, found that that was not anything that Barbara Eymann had to do. In fact, when I finally showed her the disability policy and gave it to her, I said, where does it say in this disability policy that you can't terminate Mr. Healy and have him get all the benefits and still get his disability? She goes, well, I've never seen that before. Here she is, vice president in charge of human resources. She's never looked at the disability policy, but her prior testimony was, I told Mr. Healy that I would look at the policy and get back to him. She got back to him, and that's what P and Q are in July of 98, is I can't legally terminate you. And when she transferred to EDS in July of 99, she still had the same story, sends the email, I put it in the brief, I can't remember what the exhibit number is, saying to Dorothy Cullum, I can't, you can't legally terminate Mr. Healy while he's on disability, even though she also admits under oath that she knew that it was an ADA requirement that, in fact, she couldn't terminate him. But that's not the only intentional misrepresentation that she made. She says, I have talked to legal, and I can't legally terminate you. Okay. Dorothy Cullum, the EDS senior labor lawyer, who admits that as soon as she got involved in August of 99, knew, and this is about eight years ago, that Mr. Healy was owed his severance pay. She knew it, and she thought, and they put in their statements, their trial, their suggested statements for the court, that, in fact, Dorothy Cullum thought that Barbara Eyman was trying to cheat EDS by not paying Mr. Healy. We also know that $264,000 in credits went from system house to EDS to cover that separation amount, which Dorothy Cullum admitted that she knew they owed him in August of 99. I think I understand how that makes EDS responsible for the severance pay, but how does EDS become responsible for the, what shall I say, misstatements of MCI systems house lawyer? Okay. Dorothy Cullum worked for EDS. I'm talking about the other lady who you were describing as having told your client that he couldn't be terminated. That's Barbara Eyman. That's who I thought I said. She's not an MCI employee. She's the head of human resources for system house. He represents system house, too. We sued system house. It was called MCI system house. Okay. And you've sold system house. No. MCI sold system house to EDS. Even more important is system house was a corporation. Yes. Its stock was sold. Not the corporation. The stock was sold to MCI. Okay. So the, I'm sorry. You have lost me now. Okay. MCI system house was a separate corporate entity, right? Okay. First of all, it was called system house. Yes. Then MCI bought all the stock. Yes. And renamed it MCI system house. And Inman worked for MCI system house, correct? Which was still system house. Okay. Okay. The, and let me tell you that when I brought it up, they filed summary judgment. I filed summary judgment. And what I did in that summary judgment was I said, this is a company, system house. They've changed the name, but it's always been, you know, the 10 million shares were bought by MCI. When WorldCom took over MCI, WorldCom got the 10 million shares. But system house is still its own entity. And who owns it now? Okay. System house, WorldCom then sold system house to EDS. That's what I thought. So when they bought that, since they bought all the stock, they bought all the liability. And I looked, when I did my. But wait, before you go on, the critical thing that I think perhaps I was missing here is that EDS, I'm sorry, whatever system house is called today, still exists as a corporate entity? No. During all the time that we're involved, yes. Okay. During all times relevant to this case, it still existed. Correct. Owned by EDS in the later days. EDS changed the name to EDS SHL. Okay. And whatever that company is called, is it still a defendant in this company, in this case? It is still a defendant in the case. And it's now been taken over and taken, rolled within EDS. Merged. Merged within EDS. Okay. So they have, by law, and the district court found, and I couldn't find a single case that would even indicate anything else, when you buy all the stock in a company, you buy all the liability. Well, that's what I was having trouble with. But, you know, long way around. You've answered my question. Thank you very much. I'm sorry. Well, I apologize for being sort of obtuse about the question. Well, I don't think you were obtuse. I think there are some unique, difficult issues here. But, anyway, so SHL is still before us. Mr. Hutton represents them. A little bit shy in telling me that he represents System House. But, anyway, if I can then go to the agreement itself, the separation agreement. Again, it's almost identical to the one that expired on August 1st of 1998. There's no real difference to that. At the time the new one was made, they knew that Mr. Healy was going out on disability. They knew he had to. He'd made that extremely clear. Then up front, there's all sorts of emails on that issue that we provided. So anyway, the separation amount was due and owing on December 31st, 1998. The district court judge found that by way of summary judgment. They have now even admitted it in their brief. By admitting that EDS owes the separation amount, they basically agreed, first of all, that they're responsible for the separation agreement, which they are and would be anyway. Secondly, that the agreement was breached. Thirdly, their own labor lawyer, Dorothy Cullum, admitted that she knew the separation agreement amount was due. The court also found that $264,000 had been transferred to them to take care of that separation amount. When EDS bought System House from MCI Worldcom. But the ISUs are also part of the separation agreement that was breached. Even in their brief, they admit that there was a breach. ISUs are deferred compensation. Mr. Healy had already earned that money, other than a 25% matching amount. So it was vested, but was not yet given to him because it was deferred, being deferred. But as we all know, the agreement, the ISU agreement provides that when you are terminated, unless it's for cause, they automatically, instantaneously vest. And the court so found in the motion for summary judgment, and the appellant has admitted that the ISUs did vest. Their only argument is, even though they vested on December 31st, 1998, and even though the court found that by March of 1999, three months later, they should have been sold, he should have had his money. They're claiming that, well, MCI also made a mistake, and therefore that lets us off the hook. That's the only basis that they're claiming that the ISUs don't apply. Is, yeah, we screwed up, but MCI screwed up too about a year and a half later, and so all's well. What really happened is, when we talk about Mr. Healy being forced to go on disability, the head of System House said, oh, we have this MTA project that you didn't, you know, that wasn't part of the agreement to shut down the business, but if you could help us with that, even though you're out on disability, we'd appreciate that. So Mr. Healy is not getting a penny from System House. Still continues to work until July of 1999, and we have, one of our exhibits we've quoted in our brief is the fact that he was able to get $248,000 more than anybody expected during this time that he was forced to be on disability, because he's still continuing to help System House. This is the same time that Dorothy Cullum and Barbara Eyman are conspiring to keep him from getting his separation money by claiming they can't legally give it to him because he's on disability, even though he's earned it. It was in his prior agreements. They've done the same thing with the ISUs. His deferred income that the agreement says you get right now, they're not giving to him because you're on disability, even though he continues for seven months to work for them and brings System House, now owned by EDS, another $248,000. Never asked for a penny. Okay, the stock option issue. What they want you to do is ignore the court's finding, because the agreement reads, the separation agreement reads at paragraph 1.3, employee will be permitted to exercise stock option grants in accordance with MCI's stock option plan. The terms and conditions of the 1997 Deferred Incentive Program for a termination without cause will apply. That's all one paragraph all in there together. And I said to the court, I said, it's clear from this agreement, there's no ambiguity whatsoever that the agreement says that the termination without cause will apply for stock options. And in the separation agreement, there are two other places where it says, MCI agrees to retain employee on his current annual basis for pay through December 31st, 1998, at which time employee will be terminated. Employee's termination will be designated as a termination without cause. Paragraph 1.3, the other part of it, also notes that it will be considered an involuntary termination without cause. Okay. We know that the ISUs have already vested. That's not an issue. They vested before the agreement was even written. This is the stock option agreement, will be determined according to a termination without cause, which means that the stock options automatically, and they quoted at page 9 of their brief, that if it's a termination without cause, then the stock options invest immediately and must be sold within a three-month period. Okay. Instead of that, what they try to do is say, oh, no, you went out on disability, you're 48 years old, you're going to be disabled on disability until age 65. Does the agreement say that that stock must be sold within three months? Yes. What paragraph is that? I quoted in my brief. Okay, fine. Go ahead. If I have time, I will look it up. The stock option agreement also says that they are not exercisable after 10 years. So if Barbara Iman's misrepresentation to Mr. Healy is, you've got to go out on disability now or else you'll lose it, and by the way, you're not going to get your stock options until you turn 65 or die. So if he died in the 10-year period, his family would have gotten them. Otherwise, if he lives to retirement, the stock options expire in 10 years, so he gets nothing there. So, you know, basically they're doing everything they can to keep him from getting every single thing he's got. He's got two multibillion-dollar companies, and EDS has gotten $264,000 from System House. They've gotten $248,000 from him. And, frankly, if you look at my brief, had they done what they should have done in July of 99, wouldn't it cost them a penny? Had they done the right thing by this man because the stock was still up? Had they terminated him? But they continued with the story of we can't terminate you because you're on disability. Barbara Cullen knew that was wrong. She talked to the head of labor for EDS, and you know that's for the labor lawyers. That's a big organization. Nick Lynn quoted that in there, talked to him, told him, I think Mr. Healy's entitled to all these things under a separation agreement. Nick Lynn said, well, you know, basically we're not going to pay him. But Barbara Cullen, it was an incredible testimony. The senior lawyer for EDS gets on the witness stand, and I'm thinking she's going to make life real difficult for me. She goes, yeah, I knew as soon as I became involved in August of 99 that he was entitled to it. But it was joint and several responsibility. So I was trying to get MCI to pay it. Well, Healy wrote her. They had 19 different emails and letters going back and forth where Healy's saying, who's going to pay me my severance? And Mr. Healy believed them. He was saying, when I turn 65, who's going to pay me my severance? And Dorothy Cullen carries them around for two years and then sends them the Kissoff letter, oh, we're not going to pay you now, we're not going to pay you ever, whether you turn 65 or not. But she did try to, she got an annuitist to tell her that it was, the present value of the $264,000 when he turned 65 would only be $90,000, even though she knew he was entitled to it now and so testified. The only thing, if I can see one. Roberts. Just come on, so sum up. Yeah.  Prejudgment interest. The Levy-Zender case was a couple of appraisers deciding what property was worth. We had testimony here we put on that was credible. The court still found. They didn't oppose it. They didn't put on any testimony. So anyway, we think we're entitled to all of that. They didn't argue fraud and I think it would have been difficult for them to do. I appreciate the question. Thank you. You've saved about a minute and 50 seconds. I'll probably use it. With deference to my very honorable, respectable adversary, there are lots of things that he said that just aren't in the record. I faithfully wrote briefs that track what happened and what didn't happen. I do want to simplify, if it helps with the timing. EDS bought the stock of System House. We do stand in their shoes. The only other thing that the court might not piece together is that sale occurred in April of 99. So by that time, if the agreement had been carried out, it should have been terminated, which is what caused some of the confusion. We are not saying MCI screwed up so that we're off the hook. That's not our position. Although it is true, it's their plan. They administer it. Neither System House nor EDS had anything to do with it. The contracts were between MCI and Mr. Healy. And it is true that MCI blew it twice, January of 99 and again 13 months later. What I am saying is I accept responsibility that we may have caused them to blow it the first time. But in the normal course, if that had never happened, if there had been no separation agreement, he would have gotten all that stock 13 months later when it was worth more. So I just don't see the damages there. It goes against any measure of damages to settle EDS or System House, whichever you want to say, with a million-plus in damages or whatever that number ends up being, if you get prejudgment interest for what is completely MCI's mistake where there's no showing of a nexus. Okay. Your red light just came on, so if you would sum up, that would be helpful. I think anything else I say would not be as well said as we put it in the brief. Okay, good. Thank you. Thank you both for your very helpful argument. The case of Healy v. Electronic Data System Corporation is now submitted on the briefs, and we are in adjournment until tomorrow morning. The support for this session stands adjourned.
judges: Goodwin, W. Fletcher, Holland